MORGAN CONST. CO. et al. v. FORTER–MILLER ENGINEERING CO. et al.

(District Court, W. D. Pennsylvania. February 24, 1913.)

No. 104.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—FURNACE FOR HEATING INGOTS.

The Morgan patent, No. 632,020, for a furnace for heating ingots or billets, covers a combination of elements, all of which were concededly old in the art; but the dominant feature of the combination, which consists in so arranging the fuel and air ports as to fix a zone of maximum heat at a certain point in the furnace and the construction of an inclined track with its apex in such predetermined zone, so as to quickly and automatically remove the billet therefrom for delivery at the mill with a minimum exposure to the air, was new, and, as so limited, the patent was not anticipated and is valid. It is not infringed, however, by a furnace which is so constructed that the zone of maximum heat cannot be predetermined, but is subject to variation.

2. PATENTS (§ 328*)—INVENTION—FURNACE FOR HEATING INGOTS.

The Laughlin & Reuleaux reissue patent, No. 11,666 (original No. 582,-476), for an improvement in a continuous heating furnace for heating billets or ingots, is void for lack of invention in view of the prior art.

In Equity. Suit by the Morgan Construction Company and Alexander Laughlin against the Forter-Miller Engineering Company, Dilworth, Porter & Co., Limited, and Lawrence Dilworth, Chairman. On final hearing. Decree for defendants.

Christy & Christy, of Pittsburgh, Pa. (J. Nota McGill, of Washington, D. C., of counsel), for complainants.

Charles M. Clarke, of Pittsburgh, Pa., for defendants.

YOUNG, District Judge. The complainants filed their bill of complaint, charging the defendants with having infringed certain letters patent owned by the complainants. It appears from the bill of complaint that letters patent of the United States, No. 632,020, were granted to the Morgan Construction Company, as assignee of C. H. Morgan, for an improvement in furnaces for heating ingots or billets, and that letters patent of the United States, No. 582,476, were granted to Alexander Laughlin, as the assignee of Alexander Laughlin and Joseph Reuleaux, and that subsequently the last letters patent were

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

reissued to Alexander Laughlin; the reissue number being 11,666. It also appears by the bill of complaint that, under the letters patent No. 632,020, Alexander Laughlin, one of the complainants, obtained the exclusive right, except as to the Morgan Construction Company, to manufacture and use the said invention, and that the said Morgan Construction Company, under the said letters patent No. 11,666, obtained the exclusive license, except as to Alexander Laughlin, to manufacture and use the invention described in that patent. The complainants in their bill of complaint limit the infringement of the Morgan patent, No. 632,020, to the third, fourth, fifth, sixth, and seventh claims thereof, and also limit the infringement of letters patent No. 11,666 to the tenth claim thereof.

The defendants in their answer set up as a defense that they have not infringed the complainants' patents; and, further, that the said Charles H. Morgan, the complainants' assignor of patent No. 632,020, was not the original inventor of the alleged inventions and improvements described in said letters patent, but that the inventions and improvements described in said letters patent were prior to the alleged inventions of Morgan fully described in certain letters patent issued in the United States and in certain British and German patents; and also that the inventions and improvements claimed in said letters patent had theretofore been used at the Cambria Iron Works in the city of Johnstown, Pa., in the year 1886. As to patent No. 11,666, the defendants set up the defense that the said Alexander Laughlin and Joseph Reuleaux were not the original inventors of the alleged inventions and improvements described in those letters patent, but that the inventions and improvements described in those letters patent were prior to the alleged inventions of Laughlin and Reuleaux fully described in certain letters patent issued in the United States.

We shall consider this case in the following order: First. Were the letters patent granted to Charles H. Morgan under the number 632,020 anticipated by other patents or prior use? Second. If said letters patent were not anticipated, what is the scope of the invention made by Charles H. Morgan? And, third. Have defendants infringed those letters patent as construed and limited by the court? It will also become necessary to consider, first, whether or not the letters patent, No. 11,666, granted to Laughlin and Reuleaux, were anticipated by other patents; and, second, whether the defendants have infringed those letters patent.

[1] An examination of the letters patent cited as in anticipation of the letters patent involved in this case, viz., Allen's United States patent, No. 234,162, Daniel's United States patent, No. 385,247, and Daelen's German patent, No. 74,484, together with the file wrapper and contents of Morgan's application in the Patent Office, and together with the expert witnesses on both sides of the case, clearly shows that all of the elements claimed in Morgan's patent had been theretofore invented and used. This is clearly seen, if we first set down before us the claims of the Morgan patent:

"1. The combination, in a furnace for heating ingots or billets, of a heating-chamber, conduits for gaseous fuel opening into said heating-chamber and at opposite sides thereof, whereby two opposing currents of gaseous fuel are

directed transversely into said heating-chamber, and means for imparting a downward direction to each of said currents as it approaches the center of the heating-chamber, substantially as described.

"2. The combination, in a furnace for heating ingots or billets, of a heating-chamber, conduits for gaseous fuel opening into said heating-chamber at one end and at opposite sides thereof, whereby two opposing currents of gaseous fuel are directed transversely into said heating-chamber, means for imparting a downward direction to said currents as they approach the center of the heating-chamber, and an escape, flue at the opposite end of the heating-chamber, whereby said transverse currents are diverted into a longitudinal current, substantially as described.

"3. In a furnace for heating ingots or billets, the combination with a heating-chamber having openings at opposite ends for the admission and delivery of heated ingots or billets and an opening for the admission of gaseous fuel to said chamber, between its ends, whereby a zone of maximum heat is maintained, of an inclined track extending from said delivery opening to a point between the charging end of the furnace and a vertical plane passing transversely through said chamber and said fuel opening, by which a heated ingot or billet is moved by gravity from the zone of maximum heat through said delivery opening, substantially as described.

"4. In a furnace for heating ingots or billets, the combination with a heating-chamber having openings at opposite ends for the admission and delivery of heated ingots or billets, and an opening for the admission of gaseous fuel to said chamber, between its ends, of an inclined track extending from said delivery opening to a point between the charging end of the furnace and a vertical plane passing transversely through said chamber and said fuel opening, and a pushing mechanism by which the ingots or billets are pushed upon said inclined track, substantially as described.

"5. In a furnace for heating ingots or billets, the combination with a heating-chamber having an opening at one end for the admission of ingots or billets, an opening for the delivery of heated ingots or billets, and an opening for the admission of gaseous fuel to said chamber between the charging end of the furnace and said delivery opening, of an inclined track extending from said delivery opening to a vertical plane passing transversely through said chamber and through said fuel opening, whereby the ingots or billets as they become heated, are carried by gravity through said delivery opening, substantially as described.

"6. In a furnace for heating ingots or billets, the combination with a heating-chamber provided with an opening at one end for the admission of ingots, an opening at its opposite end for the delivery of heated ingots and an opening near the delivery end of the chamber for the delivery of gaseous fuel, of a track extending longitudinally through said chamber, and having an inclined section inclosed within said chamber and extending from said delivery opening to a vertical plane passing transversely through said chamber and said fuel opening, whereby an ingot in passing over said track is acted upon by gravity at a point opposite said fuel opening, and moved out of the heating-chamber, substantially as described.

"7..In a furnace for heating ingots or billets, the combination with a heating-chamber having an opening at one end for the admission of ingots, an opening at its opposite end for the delivery of heated ingots, and an opening near the delivery end of the chamber for the admission of gaseous fuel, of a track extending longitudinally through said chamber, said track having an inclined section on which the ingots are moved by gravity, extending from said delivery opening to, a vertical plane passing transversely through said chamber and said fuel opening, thereby bringing the inner end of said inclined section opposite the fuel opening, and a pushing mechanism by which the ingots are pushed along the track and upon said inclined section, substantially as described."

These claims have been carefully analyzed by Prof. Wadsworth, called by defendants as an expert (Defendant's Record, 186), and we adopt that analysis for the purpose of this case:

Claim 3. "In a furnace for heating ingots or billets, the combination with (1) a heating-chamber having (a) openings at opposite ends for the admission and delivery of heated ingots or billets, and (b) an opening for the admission of gaseous fuel to said chamber, between its ends, whereby a zone of maximum heat is maintained, of (2) an inclined track extending from said delivery opening to a point between the charging end of the furnace and a vertical plane passing transversely through said chamber and said fuel opening, by which a heated ingot or billet is moved by gravity from the zone of maximum heat through said delivery opening."

Claim 4. "In a furnace for heating ingots or billets, the combination with (1) a heating-chamber having (a) openings at opposite ends for the admission and delivery of heated ingots or billets, and (b) an opening for the admission of gaseous fuel to said chamber, between its ends, of (2) an inclined track extending from said delivery opening to a point between the charging end of the furnace and a vertical plane passing transversely through said chamber and said fuel opening, and (3) a pushing mechanism by which the ingots or billets are pushed upon said inclined track."

Claim 5. "In a furnace for heating ingots or billets, the combination with (1) a heating-chamber having (a) an opening at one end for the admission of ingots or billets, (a') an opening for the delivery of heated ingots or billets, and (b) an opening for the admission of gaseous fuel to said chamber between the charging end of the furnace and said delivery opening, of (2) an inclined track extending from said delivery opening to a vertical plane, passing transversely through said chamber and through said fuel opening, whereby the ingots or billets, as they become heated, are carried by gravity through said delivery opening."

Claim 6. "In a furnace for heating ingots or billets, the combination with (1) a heating-chamber provided with (a) an opening at one end for the admission of ingots, (a') an opening at its opposite end for the delivery of heated ingots, and (b) an opening near the delivery end of the chamber for the delivery of gaseous fuel, of (2) a track (c) extending longitudinally through said chamber, and having (d) an inclined section (d') inclosed within said chamber, and (d'') extending from said delivery opening to a vertical plane passing transversely through said chamber and said fuel opening, whereby an ingot in passing over said track is acted upon by gravity at a point opposite said fuel opening, and moved out of the heating-chamber."

Claim 7. "In a furnace for heating ingots or billets, the combination with (1) a heating-chamber having (a) an opening at one end for the admission of ingots, (a') an opening at its opposite end for the delivery of heated ingots, and (b) an opening near the delivery end of the chamber for the admission of gaseous fuel, of (2) a track (c) extending longitudinally through said chamber, said track having (d) an inclined section on which the ingots are moved by gravity, (d'') extending from said delivery opening to a vertical plane passing transversely through said chamber and said fuel opening, thereby bringing the inner end of said inclined section opposite the fuel opening, and (3) a pushing mechanism by which the ingots are pushed along the track upon said inclined section."

The elements, we thus see, are the oblong furnace, the water-cooled pipes making a track for the support of the billets, an inclined track at the delivery end, means for introducing fuel and air into the furnace, and a pushing device to cause the billets to move forward. An inspection of the prior patents, especially the Allen, Daniel, and Daelen patents, as well as the prior state of the art, as shown by the Cambria furnace in use in 1886, conclusively shows that each of these elements or instrumentalities was old. Not one of them but exists in some form or was included in some claim of some one of the patents referred to or in the Cambria furnace. The patentee recognized this, and on page 3 of his specification, at line 115, he says:

"I am aware that the individual instrumentalities embodied in my improved furnace have been used before my invention, and I do not claim such broadly; but such use was in combinations substantially different from those devised by me.

"I have described what I consider the most desirable means for maintaining a zone of maximum heat contiguous to the wall of the furnace at the delivery end of the heating-chamber, comprising opposite side openings for transverse currents of gaseous fuel and inclined roof-surfaces; but I do not wish to confine myself to the specific means described, as the same may be modified and still come within the scope of my claims.

"I am aware that it is not new to construct a furnace with openings at the opposite ends of the heating-chamber for the admission and delivery of ingots or billets, and with an inclined track leading from the delivery opening of the heating-chamber to a conveyer and inclosed within a separate chamber from the heating-chamber."

This was but the summing up of what appears over and over again in the contents of the file wrapper of this patent. It appears, then, that the patentee took these instrumentalities, every one of them conceded to be old, and formed the combination set out in his claim.

It must be apparent, from a consideration of the specification and claims of this patent in the light of the former patents and of the limitations fixed by the applicant as required by the Patent Office, and as shown in the file wrapper and contents and the evidence now before us, that the main purpose of the Morgan patent was to fix a zone of maximum heat in the furnace and to bring to or within that zone an inclined track, so that, immediately upon the ingot or billet reaching the point of maximum heat, it might be taken quickly and automatically from that zone to a conveyer, so as to be removed to the reducing mill. The patentee could not determine the apex of this inclined track, unless he could have a well-defined and fixed zone of maximum heat. This appears throughout the history of the case while in the Patent Office, it appears in the specifications, it appears in the claims, and it appears in the evidence of the witnesses interrogated as to the patent.

On page 33 of complainants' record, Mr. Julian Kennedy, a witness for complainant, and one of the highest authority, testified:

"The essence of the invention of Morgan is clearly and plainly in arranging a gravity or automatic device for quickly taking the billet from the zone of highest heat in the furnace to the outside of the furnace without allowing it to linger at the end wall, where it would be chilled and possibly oxidized by air accidentally coming in through the crevices around the door left for allowing the bloom to pass out."

And again, on page 34, after testifying as to claim 3, he says:

"The vital feature of this claim is the inclined track extending into the zone of maximum heat. In the specification the inventor specifically does not limit himself to any particular location of this zone; but he does run this inclined track into this zone of maximum heat, wherever it may be."

Again, on the same page, he says:

"The vital point of claim 3 is also the vital point in claims 4, 5, 6 and 7. These vary in detail and call attention to other features of the furnace; but in each of them the central idea and the dominant feature is the inclined track running into the zone of highest temperature, thus allowing the billet to be quickly abstracted from this zone of highest temperature and gotten out to the mill with a minimum exposure to the air and to oxidizing gases."

Prof. Wadsworth, a witness for defendants, after discussing the arrangement of the fuel ports and high-arched furnace roof (pages 169 and 170), says, on page 178:

"Every feature of the design and arrangement of parts—side wall, fuel ports, high crown, and transversely arched and inclined furnace roof—at the front or fuel end of the Morgan continuous furnace bears evidence of a particular aim or purpose on the part of the patentee. The purpose, as set forth over and over again in the specifications, is to maintain 'a zone of maximum heat * * * at the delivery end of the heating-chamber and continues to the end wall of the chamber.' (See lines 12 to 15, page 2, of the specification.) 'A zone of maximum heat, which is either within or approximate to the plane of the fuel opening, depending upon the strength and direction of the current of incoming fuel, and also upon the strength of the longitudinal current induced by the escape flue at the opposite or charging end of the furnace.' (See lines 40 to 46, page 2, of the specification.) 'A zone of maximum heat contiguous to the delivery end of the furnace. (See lines 112, 113, page 2, of the specifications.) 'A zone of maximum heat contiguous to the vertical end walls of the heating-chamber, with a gradually increasing temperature towards the entrance end of the chamber.' (See lines 26 to 30, page 3, of the specifications; also lines 122, 125, same page.)"

The apex of the inclined track must be determined by the zone of maximum heat. The zone of maximum heat was not to be determined by the apex of the inclined track. The pushing device, the arrangement of the billets crosswise, upon longitudinal tracks, the discharge of the billets, either through the sides of the furnace or at the end of the furnace, the introduction of fuel and air into the furnace, so as to gradually heat the billets from the charging end to the delivery end, were all old, and not only old as separate elements, but old in combination, as in the Cambria furnace and in the Allen patents, British and American. All, then, that the patentee added to the combination was the fixing of a zone of maximum heat and the projecting into that zone of an inclined track, the one terminus of which should be its apex within the zone and the other terminus the delivery opening. The introduction of the fuel and air near the delivery end was old, as in the Daelen patent; the inclined track was old, as in the Daelen patent; but the quick passage of the heated billets from the zone of maximum heat was new, and the means of effecting this, viz., the projection of the inclined track into a zone of maximum heat, that zone being predetermined by the adjustment of the fuel and air openings, so as to produce the maximum heat at a certain point in the furnace, was new; and for this he was entitled to a patent. His claims must therefore be limited and interpreted as meaning only, in a furnace for heating ingots or billets, the admission into said furnace of gaseous fuel in such manner that a predetermined zone of maximum heat is maintained within certain limits in the heating-chamber thereof, and adjacent to the delivery end of the furnace, in combination with an inclined track, extending from the delivery opening of the furnace to or within the zone of maximum heat.

Let us now inquire whether or not defendants have infringed the Morgan patent as thus limited. Albert K. McMillen, a witness for complainants, who had seen the defendants' furnace in operation, produced a drawing of it marked "Complainants' Exhibit No. 1, Drawing Defendants' Furnace" (Complainants' Record, 19), a copy of the same

being attached to the Complainants' Record at page 245, and during his examination marked numbers on it showing the different parts, and which are, explained by the witness, beginning at page 15 of Complainants' Record. This drawing is conceded to be a fair general representation of defendants' furnace. It is described by Mr. Julian Kennedy, on page 35 of Complainants' Record, and the succeeding pages, as follows:

"Q. 6. Have you read the deposition of Mr. A. K. McMillen, a witness in behalf of the complainants in this cause, and have you examined and do you understand the 'Complainants' Exhibit No. 1, Drawing of Defendants' Furnace,' referred to by Mr. McMillen? A. I have, and I do. Q. 7. Now, will you please state to the court your understanding of the construction and operation of the furnace shown by 'Complainants' Exhibit No. 1, Drawing of Defendants' Furnace,' and in doing so please point out such resemblances, if any, as you may find between the furnace shown by such exhibit and the furnace shown and described by letters patent to Morgan, No. 632,020, and particularly as defined by claims 3, 4, 5, 6, and 7 thereof? A. The furnace shown on the drawing mentioned, Complainants' Exhibit No. 1, as will be evident to any one looking at it, is very similar to the one shown in the patent to Morgan."

It is also described by Prof. Wadsworth (Defendants' Record, 249) as follows:

"The air for the combustion of the fuel is introduced through a transverse passageway *10*, running across the furnace above the fuel inlet opening, and provided with a series of vertical ports *11* and horizontal ports *12*; the former discharging a portion of the air in downward direct currents, which meet and commingle with the entering gas streams in the spaces above the inclined gravity discharge track *16*, while the latter discharge the remainder of the air supply in horizontal, longitudinal entering currents, that meet and commingle with the lower gas and air currents in the space back of the beginning of the gravity incline discharge. Combustion will begin at a point a little back of the first set of air ports *11*; but it cannot, of course, be completed until the ignited and burning mixture of gas and air has been supplied with the additional air which enters through the air ports *12*. As the currents of gaseous fuel and currents of air, passing through the ports *12*, both enter the heating-chamber in longitudinally directed streams at a considerable velocity, the point of complete combustion—or substantially complete combustion—will, in defendants' furnace, be carried well back into the heating-chamber proper, and the zone of maximum heat and maximum temperature will in consequence of this be located at a considerable distance from the delivery end wall of said chamber."

It may be assumed, then, that the furnaces bear a strong resemblance to each other. But the vital question is: Have defendants infringed the Morgan patent as construed hereinbefore? And this turns about the inquiry as to the manner of obtaining a zone of maximum heat. In the Morgan furnace, we have seen that the gaseous fuel and air are brought in through openings in the opposite side walls, so that these commingling currents of gas and air are introduced transversely to the heating-chamber and are given a downward direction by the arched roof, so that there is produced a predetermined zone of maximum heat within the furnace and adjacent to the delivery end thereof.

Referring to the drawing (page 245 of Complainants' Record) and to McMillen's testimony (page 23), in the defendants' furnace the gas and air are brought horizontally into the furnace through the openings *9* and *11* in the delivery end wall, so that they commingle below

*11*, where combustion commences; complete combustion being obtained just inside the arch *21*, and the zone of maximum heat extending a width of three or four feet from *21* to *22*. Kennedy was asked (Complainants' Record, 46):

"XQ. 32. Do you agree with the witness McMillen in locating the point or zone of maximum heat at all the points indicated by the numeral *22* on the exhibit drawing? (Complainants' counsel objects to the statement of the question as inaccurate, and refers to XQ.'s 93-95 of McMillen's testimony.) A. The point of maximum heat in a furnace probably changes from time to time according to the speed with which the material to be heated is passed through it and possible variations in the fuel supply. I should judge, however, that the point of maximum heat might be within a very short distance either way of the points marked *22*, or it might under certain conditions be moved over toward the points marked *20*. Anywhere between these points, however, I should judge would be in a zone of heat which would be amply great for imparting the proper temperature to a billet, whereas close to the end of the chamber there would be a zone which would not be nearly so hot, and in which combustion would be incomplete, and where, also, there would be more or less free oxygen in the gaseous currents."

It is unnecessary to refer to the other evidence in the case upon this point, because an examination of it, as well as of the evidence above referred to, results in the conclusion that in defendants' furnace the gas and air are brought through the end wall and longitudinally of the furnace, so that a zone of maximum heat is found between the points *21* and *22*. This is just where the defendants' construction departs from the Morgan patent. In the Morgan patent, as we have said, the zone of maximum heat is predetermined by bringing the fuel and air into the furnace from opposite sides and near the top of the furnace, so that the commingling currents will pass transversely into the furnace and have a downward or vertical direction, thus fixing at a certain point in the furnace a zone of maximum heat, and thereby fixing the point of the apex of the inclined track. The patentee of the Morgan patent was limited to the introduction of the air and gas through side openings, so that the current would be transverse of the heating chamber; and he was also limited to a manner of introduction so that those currents would pass down vertically, and not horizontally, for that was the only way to predetermine a zone of maximum heat and determine where the apex of the inclined track should be. The zone was not to be left to change or chance—that change or chance which might occur from the increased or lessened pressure of air or gas, as described by Prof. Wadsworth and Mr. Kennedy, or from the lowering of the temperature of the furnace by the forcing of the furnace by the too rapid introduction of cold billets, or by the pulling of the currents of air and gas by increased draft through the stack and away from the apex of the inclined track—but the certainty of a fixed zone was secured by the vertical transverse introduction of the gas and air just in the manner described. This fixing of the zone was also necessary, so that the billet might be removed from the zone of greatest heat, the very essence of the Morgan invention, and not pass through a cooler zone, which would occur, if the zone by change or chance was moved towards the charging end of the furnace.

The defendants' construction, as we have seen, is defined, and it is readily seen that the zone of greatest heat in it might vary greatly.

(Wadsworth, Defendants' Record, 249; Kennedy, Complainants' Record, 46.) It is apparent, by the introduction of the air and gas through the end wall horizontally, as in defendants' furnace, it would be impossible to determine the exact zone of highest temperature, and to so regulate the furnace that the zone would be constant and always at practically the same place. Mr. Wellman, an expert for defendants, says (page 118, Defendants' Record):

"The exact point of highest temperature would be very hard to determine, depending altogether on the manipulation of the gas and air and chimney damper, by the heater in attendance. If he thoroughly understood his business, this point could be varied within quite a high range. The hottest point in my judgment, in the regular working of the furnace, would be at a point between the point of entrance of the gas and the outlet of the same, probably at a point about 25 per cent. of that distance."

In a furnace 40 feet in length the zone of greatest heat would be 10 feet from the delivery end wall. Unless this zone could be determined, therefore, and practically always kept at the same place in the furnace, the position of an inclined track could not be constructed so as to have its apex at or within this zone. The construction of the inclined track would necessarily be without regard to the zone of highest heat, and in the operation of the furnace would leave a cooler zone between the apex and the zone of highest temperature. The evidence shows that this cooler zone does exist in defendants' furnace. Prof. Wadsworth (page 250, Defendants' Record) says:

"The temperature measurements made by Mr. Knote show that this zone of maximum temperature in defendants' furnace is, in fact, located nearly five feet back or away from the end wall containing the fuel entry ports 9, and fully three feet away from the point of beginning of the gravity discharge incline or slope 16. Mr. Knote's measurements show that the temperature in the furnace chamber at a point very close to the head or beginning of the inclined slope 16 is about 1190 degrees Centigrade, whereas the maximum temperature measured at a point some three feet or more away from this was 1380 degrees Centigrade. There would, therefore, be a difference in temperature of 190 degrees Centigrade—342 degrees Fahrenheit—between this zone of highest temperature in the furnace chamber and the point where the bars are discharged by gravity down the incline 16. As I have already pointed out, there is an interval of about three feet between the zone or plane of highest temperature and the beginning of the gravity discharge track, and this three-foot interval would contain 24 1½"x1½" bars. According to Mr. Devlin's testimony (see answers to Q. 5 and XQ.'s 64 and 65, of first deposition; Defendants' Record, pages 48, 55, and 56), the bars are delivered from defendants' furnace at an average of about one in every 18 seconds. The bars would, therefore, on the average, lie on the horizontal portion of the skid tracks and furnace hearth for over seven minutes (24x18 secs.) after passing through the zone of maximum heat, before they were pushed over the head of the gravity incline and discharged through the delivery door. In the normal operation of defendants' furnace, it certainly cannot be said that the bars or heated articles are 'moved by gravity through the intervening space between the zone of maximum heat and the opening' in the delivery end wall, as described by Morgan, in lines 47 to 49, page 3, of the specification, or that they are 'moved by gravity from the zone of maximum heat, through said delivery opening,' as set forth in claim 3 of the patent in suit."

It is very apparent, therefore, that defendants by their construction do not accomplish that which is the essence of the Morgan patent, to wit, the immediate passage of billets from the zone of maximum heat.

Under all the evidence in this case, considered in the light of the Morgan patent, as construed, we are of the opinion that the defendants by their construction have not infringed the Morgan patent, No. 632,-020.

[2] Let us now consider the Laughlin reissue patent, No. 11,666, which is claimed in the bill of complaint to have been infringed by defendants. First, was the Laughlin patent anticipated by other patents or prior use? And this inquiry is confined to the tenth claim thereof, which reads as follows:

"A continuous heating furnace having receiving and discharge openings at or near the ends of the furnace, and pipes or supports for the billets extending from the receiving or charging opening toward the discharge opening, and provided with one or more cinder pockets arranged adjacent to and below the rear ends of the pipes or billet supports and extending below the latter, and openings through the side walls of the furnace into said pockets, thereby permitting of the removal of the cinder during the operation of the furnace, substantially as set forth."

The element of this claim which we are to consider is:

"Provided with one or more cinder pockets arranged adjacent to and below the rear ends of the pipes or billet supports and extending below the latter, and openings through the side walls of the furnace into said pockets, thereby permitting of the removal of the cinder during the operation of the furnace."

The patents offered in evidence by the defendants are (Defendants' Record, 165): The Conklin patent, No. 132,139; the Eynon patent, No. 151,581; the Buck patent, No. 503,926; the Standish patent, No. 502,593; and the Bagley & Roberts patent, No. 550,774. So that we may determine whether or not these patents have anticipated the Laughlin patent, let us determine, by an inspection of the drawings and specifications, exactly what the Laughlin patent covers. We are aided in this by the testimony of Prof. Wadsworth, who, on page 199 of Defendants' Record, says, in describing this patent:

"The 'cinder pockets' referred to as the third element of claim 10 are, according to my understanding, the openings below 'the pipes or billet supports 11 just back of the transverse bridge wall 10, these openings extending transversely across the floor or hearth of the furnace, and being bounded in part by portions of the longitudinally extending piers 9, and in part by portions of the transverse piers 26, when the latter are used. The 'openings through the side walls of the furnace into said pockets,' which are specified as the fourth element of the claim under consideration, are openings corresponding to those marked 24, 24, 24, in both Figs. 2 and 14 of the Laughlin & Reuleaux patent drawings; these openings being provided, as already explained, for the removal of the cinder or scale that may accumulate in said pockets."

Also on page 227 of Defendants' Record:

"Claim 10 of the Laughlin reissue patent in suit sets forth a combination of four parts or characteristics of furnace construction, comprising, generally stated, two opposite end openings to the heating chamber, pipe or billet supports, extending from the charging opening toward the discharge opening, cinder pockets arranged adjacent to and below the pipes or billet supports near what I have termed the front end—but what the Laughlin patent in suit refers to as the rear end—and openings through the side wall of the furnace into these cinder pockets. The drawings of the Laughlin & Reuleaux patent show only constructions in which the parts, which are referred to in this claim as 'cinder pockets,' are on the same level as the main bed or hearth

of the furnace chamber. These pockets are 'below' the billet supports only because said supports are raised on piers above the furnace bed. The side door openings *24*, which communicate with these so-called 'cinder pockets,' are likewise entirely above the level of the main bed or hearth of the Laughlin & Reuleaux furnace construction."

This seems to be an accurate description of the patent in question.

We also have the benefit of Prof. Wadsworth's expert opinion as to the Conklin, Eynon, Buck, Standish, and Bagley & Roberts patents. On page 227 of Defendants' Record, he thus describes the Conklin patent:

"In the early Conklin patent of 1872 (No. 132,139) there is illustrated and described a furnace construction, which is not of the continuous heating type, but which has receiving and discharge openings at the stack flue end of the furnace chamber, and which has a depression at the opposite end of the furnace chamber, which constitutes, in effect, a cinder or slag pocket that is below the rear ends of the material charged into the heating chamber. This Conklin furnace also has openings—marked *G*—through the side walls of the furnace into the depressed cinder or slag pocket, and these openings permit of the removal of such slag or cinder during the operation of the furnace. It may be further noted that in the regular operation of this Conklin furnace, any scale or semisolid cinder which would not run down to the depression at the end of the furnace would be pushed down by the introduction of the bars or 'piles' of plates to be heated."

He thus describes the Eynon patent, No. 151,581, on page 139 of Defendants' Record:

"A further object or result of this construction, which is not specifically mentioned in the Eynon patent, is that the depressions in the floor of the furnace, in which the boxes of pipes *N* and *P* are located, would form cinder or scale pockets extending transversely across the floor of the heating-chamber, which would collect the scale that might be formed on the surfaces of the material being heated, and which would be scraped off or jarred off these surfaces, as the bars passed over the supporting pipes. The cinder or scale which would thus be collected in the depressions containing the boxes *N* and *P* —or, more properly speaking, in the pockets formed between the back surfaces of these boxes and the hearth of the furnace—could be readily removed through enlargements of the openings in the side walls of the furnace that receive the ends of said boxes. Although no enlargements of these openings are specifically shown in the drawings of the Eynon patent, it would be a matter easily within the skill of a furnace builder to provide them, and I think they would be provided as a matter of course, if it was found that any considerable amount of scale or cinder piled up back of the boxes *N* and *P* in the operation of the furnace. The box *Q* would also act to scrape and jar off any scale which formed on surfaces of the bars as they pass through the furnace, and such scale would drop down into the fireplace *D*, and be removed with the cinder and ashes from the pit below the fire grate."

On page 157 of Defendants' Record he thus describes the Standish and Buck patents:

"In patents Nos. 502,593, to Standish, and 503,926, to Buck, dated respectively August 1 and August 22, 1893, there are illustrated and described two furnaces, to which I call attention only for the purpose of showing that it was common and ordinary practice to provide openings or pockets in the hearth or floor of heating furnaces of all kinds and descriptions for the reception and collection of cinder and slag. In the Standish furnace, the articles to be heated are moved longitudinally through the furnace, by means of an endless conveyer chain, carrying rods or holders *H H*, which are mounted transversely on the chain and have one end bent down to form hooks *h h*, on which the blanks or articles are suspended, so as to travel along through a slot in the roof of the furnace and become gradually heated to the tem-

perature desired. The scale which forms on the heated surfaces is jarred off as the blanks move along, drops down on the floor of the heating-chamber, and by union with the silicious material of that floor forms cinder or slag, which is raked out or flows out through a tap hole $T$ (see best Figs. 3 and 5), formed in one of the side walls. The furnace shown in the Buck patent is not a continuous heating furnace at all, but is a furnace similar in its construction and mode of operation to the furnace of the early Conklin patent of 1872. Like the Conklin furnace, the Buck furnace is provided at one end with an outlet $U$ for the removal of cinders or slag from the lowest portion of the furnace hearth. In the Conklin furnace, the outlets are in the side walls of the furnace, while in the Buck furnace (see best Fig. 1), the outlet is in the end wall, and leads into a depression or pocket $B$ extending transversely across the heating chamber $A$."

On page 230 of Defendants' Record he thus describes the Bagley & Roberts patent, No. 550,774:

"In this connection, I might also call attention to the construction of the furnace illustrated and described in the Bagley & Roberts patent, No. 550,774, of December 5, 1895, which I inadvertently overlooked in my previous general discussion of the prior art. This patent shows a furnace for heating slabs, the general construction of which is well illustrated in the sectional views of Figs. 2 and 3. It is not a continuous furnace, and does not have, therefore, receiving and discharge openings at or near its ends, as called for in claim 10. It has, however, supports for the slabs or billets to be heated, which extend longitudinally of the heating chamber throughout its length, these supports being indicated in the drawings by the reference letters $H$ $H'$. It has also a cinder pocket arranged below the slab or billet supports, and has, further, openings through the side walls of the furnace into these pockets, 'thereby permitting the removal of the cinder (or slag) during the operation of the furnace.' This last feature of construction is best shown in Fig. 3 of the Bagley & Roberts patent drawings. The only difference, therefore, between the structure described in the tenth claim of the Laughlin & Reuleaux reissue patent is that the first structure is not 'a continuous heating furnace,' and for this reason does not have openings 'at or near the ends of the furnace' in the end or side furnace walls, but has instead openings near the ends of the furnace in the roof or crown of the heating chamber. It would, however, in my opinion, only involve engineering skill to provide the continuous heating furnaces of the earlier Allen and Daelen patents with the cinder pocket construction of the Bagley & Roberts furnace, and the Allen and Daelen furnaces, when so equipped, would present structures corresponding in all respects to the one generally described by the language of the claim under consideration."

It must be very apparent, therefore, from a comparison of these patents with the tenth claim of the Laughlin patent, that the providing of pockets with outlets for the collection and removal of cinder and slag in heating furnaces was well known in the art. It does not appear, in the evidence or in the argument of counsel on either side, how there could be invention in placing the cinder pockets at the discharging end of the furnace, as shown in Fig. 6 of the drawings, at the places marked *23*, or in providing doors *24* for the removal thereof. In our opinion, the providing of pockets in such furnaces for cinder and slag and of openings either for the removal thereof or the outflow of the same in a melted condition was well known in the art, and Laughlin & Reuleaux were not entitled to a patent for the same. We therefore decide that the tenth claim of the Laughlin & Reuleaux reissue patent, No. 11,666, is invalid.

This makes it unnecessary to consider the question of infringement. Let a decree be drawn in accordance with this opinion.